UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.

GORDON MONTGOMERY,

        Defendant.

REPORT & RECOMMENDATION

11-CR-6083CJS

---

## PRELIMINARY STATEMENT

By Order of Hon. Charles J. Siragusa, United States District Judge, dated May 2, 2011, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 2).

Defendant Gordon Montgomery ("Montgomery") has been charged in one count of a seven-count indictment returned against him and co-defendants Robert W. Moran, Jr. ("Moran"), James Henry McAuley, Jr. ("McAuley"), Gina Tata ("Tata"), Richard E. Riedman ("Riedman"), Timothy M. Stone ("Stone"), Richard W. Mar ("Mar"), Donna Boon ("Boon"), Jeffrey A. Tyler ("Tyler") and Paul S. Griffin[1] ("Griffin"). (Docket # 126). The first count of the superseding indictment charges McAuley, Mar, Boon, Riedman, Montgomery, Tyler and Griffin with conspiring between the years 2002 and 2010 to possess with intent to distribute and to distribute methamphetamine, in violation of 21 U.S.C. § 846. (*Id.* at 2).

---

[1] Griffin pled guilty to the charge against him and was sentenced on March 25, 2013. (Docket # 392).

Currently pending before the Court is Montgomery's motion to suppress statements,[2] as to which this Court conducted an evidentiary hearing on March 1, 2013. (Docket ## 312, 387, 399). For the reasons discussed below, I recommend that the district court deny Montgomery's motion to suppress statements.

## FACTUAL BACKGROUND

**Montgomery's Arrest on February 28, 2012**

This Court conducted an evidentiary hearing on March 1, 2013 concerning the circumstances surrounding Montgomery's arrest and the statements made by him following his arrest. (Docket # 387).[3] The government offered testimony of two agents employed by the Federal Bureau of Investigation ("FBI"), Curt Braselton ("Braselton") and Michael Preisser ("Preisser"). (Tr. 3, 55). Montgomery also testified during the hearing.

A. **Testimony of Braselton**

Braselton testified that he had been employed as a special agent with the FBI for approximately three years. (Tr. 4). On February 23, 2012, Braselton was assigned to assist with the execution of an arrest warrant for Montgomery. (Tr. 5). According to Braselton, he met with

---

[2] Montgomery's omnibus motion also sought, *inter alia*, discovery and inspection, *Brady* material, *Jencks* material, a bill of particulars, joinder in the pretrial motions of co-defendants, an audibility hearing, identification of informants, preservation of rough notes, a Rule 12(b)(4)(B) notice, *in camera* inspection of pre-sentencing reports, *voir dire* of government's experts, suppression of identification evidence, suppression of wiretap conversations and severance. (Docket ## 23, 25). On November 26, 2013, this Court recommended that the district court deny Montgomery's motion for severance. (Docket # 441). In addition, on January 10, 2013, this Court granted Montgomery's request to withdraw his motion to suppress wiretap evidence. (Docket # 355). Each of Montgomery's remaining requests were either resolved by the parties or decided in open court by the undersigned on December 4, 2012. (Docket ## 332, 333).

[3] The transcript of the March 1, 2013 hearing shall be referred to as "Tr. ___." (Docket # 387).

2

Preisser and other agents at approximately 7:00 a.m. that morning. (Tr. 26). Braselton testified that the agents learned that Montgomery was located at 98 Downing Street, Lackawanna, New York, after speaking with an individual who resided at that address, Edward Wheeler ("Wheeler"). (Tr. 5-6, 34). At the agents' request, Wheeler met them nearby and accompanied the agents to 98 Downing Street. (Tr. 6, 34).

When they arrived, Wheeler led the agents up a staircase into the apartment. (Tr. 6-7). Braselton entered the apartment first, followed by Preisser and at least one, possibly two, other agents. (Tr. 7, 24, 35-36). At approximately 4:48 p.m., Braselton entered with his gun drawn, observed Montgomery on a couch in the living room, but did not point his gun at him. (Tr. 6-7, 36). The agents announced that they were with the FBI and that Montgomery was under arrest, and Braselton handcuffed Montgomery. (Tr. 7). Braselton testified that although Montgomery seemed surprised, he remained calm and relaxed during the arrest. (Tr. 8). According to Braselton, the agents retrieved a sweatshirt for Montgomery to wear and gathered his medication from the coffee table. (*Id.*). After learning that Montgomery had recently undergone surgery, Braselton assisted him down the stairs. (Tr. 9, 42). When they were outside, the agents allowed Montgomery to have a cigarette. (Tr. 8-9).

Montgomery was placed in the back seat of an unmarked police vehicle; Braselton sat next to him, and Preisser sat in the driver's seat. (Tr. 9). According to Braselton, Preisser explained to Montgomery the charges on which he had been arrested. (Tr. 10). Preisser told Montgomery not to make any statements until after he had been advised of his rights. (*Id.*). Braselton testified that he did not recall that before Montgomery was read his *Miranda* warnings any of the agents advised him that it would be in his best interests to cooperate. (Tr. 42-45).

3

Braselton also testified that Preisser may have provided Montgomery with a copy of the arrest warrant. (Tr. 45-48).

According to Braselton, Preisser then provided Montgomery with an "Advice of Rights" form setting forth the *Miranda* rights.[4] (Tr. 10-11). Braselton placed the form on Montgomery's lap, instructed him to initial each right after it was read, and then began to read the form aloud to Montgomery. (*Id.*). After reading aloud the initial part of the form, Braselton instructed Montgomery to read the remainder of the rights aloud. (Tr. 11). According to Braselton, either he or Montgomery read aloud each right listed on the form. (Tr. 11, 16). Montgomery placed his initials on the form after each line was read. (Tr. 12, 17-18). The last line of the form stated, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (G. Ex. 1). After Montgomery was done, Braselton asked him if he would sign the form, which he did. (Tr. 12).

---

[4] The rights which were typewritten at the top of the written statement provided as follows:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.
>
> I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

(Government's Exhibit ("G. Ex.") 1).

At 5:08 p.m., Montgomery and Braselton signed the form, and Montgomery recorded the time at the bottom of the form. (Tr. 12-13). According to Braselton, Montgomery was able to read the rights out loud without difficulty and did not ask any questions about his rights. (Tr. 11-14).

Braselton testified that neither he nor Preisser asked Montgomery any questions prior to Montgomery's execution of the rights form. (Tr. 19-20). In addition, Braselton did not recall Montgomery making any statements prior to signing the form. (*Id.*). Although Braselton did recall that the name "Nixon" came up after Montgomery executed the form, he did not remember that it arose in the context of a "test question." (Tr. 46-47, 54).

According to Braselton, during the ride to Rochester, they stopped at a fast food restaurant to allow Montgomery to get something to eat. (Tr. 19). After they arrived in Rochester, they stopped briefly at the FBI office and then transported Montgomery to the jail. (*Id.*). When he was booked into the jail, Preisser executed the Advice of Rights form at approximately 7:30 p.m. (Tr. 18, 30). The two agents then discussed the arrest, and Preisser made notes about his interview of Montgomery. (Tr. 23-24, 27, 30-31). Preisser used those notes to prepare a Form 302 report approximately four days later. (Tr. 27-29).

### B. Testimony of Preisser

Preisser testified that he had been employed as a special agent with the FBI for approximately seventeen years and had participated in at least one hundred arrests. (Tr. 55, 62-63). According to Preisser, he was working on an investigation of a drug trafficking conspiracy involving Montgomery in February 2012. (Tr. 56). On February 23, 2012, Preisser was assigned to execute an arrest warrant for Montgomery that was issued on a federal indictment arising from the investigation. (Tr. 56-57). According to Preisser, the agents initially

5

had difficulty locating Montgomery, but eventually learned that he was staying with Wheeler at 98 Downing Street. (Tr. 58-59). The agents contacted Wheeler by telephone and requested his assistance. (Tr. 58-59, 73-74). Wheeler agreed and escorted Preisser, Braselton and at least two other agents to his apartment. (Tr. 59, 68, 74-75).

According to Preisser, at approximately 4:45 p.m., the agents entered the apartment with their guns drawn and encountered Montgomery. (Tr. 69, 75). In accordance with their usual protocol, they likely pointed their weapons at Montgomery until he was handcuffed. (Tr. 75). Montgomery was escorted from the residence and into the back seat of an unmarked FBI vehicle. (Tr. 59). According to Preisser, he did not recall during that series of events that any agents discussed or mentioned cooperation with Montgomery. (Tr. 78-79).

Preisser testified that he sat in the driver's seat of the vehicle, and Braselton sat in the back with Montgomery. (Tr. 59-60, 75-76). Preisser testified that it was his customary practice when making an arrest to advise the arrestee not to speak, but simply to listen to him. (Tr. 61). He testified that he typically continues by describing the charges and the seriousness of them, explaining that the agents have "very good evidence" and then advising the arrestee that "it would be to your benefit to cooperate with us." (Tr. 61-62). Preisser testified that, consistent with his usual practice, he either provided Montgomery with a copy of the arrest warrant or read the charges aloud to him and explained the benefits of cooperation, but that he did not promise anything in exchange for Montgomery's cooperation. (Tr. 60-61, 63, 66, 79-80).

Preisser testified that he did not recall that Montgomery said anything while Preisser described the charges. (Tr. 61, 63). According to Preisser, after he finished explaining the charges, he overheard Montgomery read each of the *Miranda* warnings out loud. (Tr. 64, 83).

6

Preisser then began questioning Montgomery about the investigation. (Tr. 65). Preisser testified that prior to the administration of the *Miranda* warnings, he did not ask Montgomery any questions. (*Id.*).

During the questioning, Preisser asked Montgomery whether he was known as "Nixon," but did not recall whether he used the phrase "test question" in association with that subject. (Tr. 65, 80-81, 87). Preisser testified that he asked about Nixon only after Montgomery had waived his *Miranda* rights. (*Id.*). Preisser recalled that Montgomery indicated that he had made trips to the west coast, but that the topic was not raised until after *Miranda*. (Tr. 81-82). According to Preisser, throughout the interview, Montgomery appeared to understand the questions, responded to them, and did not ask for a lawyer or invoke his right to remain silent. (Tr. 65-66).

### C. Testimony of Montgomery

Montgomery testified that on the afternoon of February 23, 2012, he was arrested by approximately four FBI agents at 98 Downing Street. (Tr. 94-95, 97). According to Montgomery, when Braselton and Preisser encountered him in the apartment, they both pointed their guns at him. (Tr. 94-95). Montgomery testified that he was handcuffed and escorted from the apartment into a vehicle. (Tr. 97).

During the escort to the car, Montgomery recalled that one of the agents told him that it would be in his "best interest to cooperate or to help [him]self, something to that matter." (*Id.*). Montgomery also testified that after he was placed in the car, he was again advised that it would be in his best interests to cooperate. (Tr. 98-99). Montgomery believed that he was advised to cooperate at least three times prior to receiving *Miranda* warnings, but conceded that

7

he was not promised anything in return for his cooperation. (Tr. 106). According to Montgomery, he asked the agents why he was being arrested. (Tr. 99). He recalled being shown a document that indicated that he was being charged with distribution of narcotics. (*Id.*).

Montgomery testified that prior to *Miranda*, Preisser told Montgomery that he was going to pose a "test question" to determine whether Montgomery was being truthful; Preisser then asked him whether he had ever been referred to as "Nixon." (Tr. 100-03). Montgomery initially responded no, but quickly corrected his answer and informed the agents that he had been called Nixon several times. (Tr. 102-03, 105). Montgomery also testified that prior to being advised of his *Miranda* rights, he made a comment about making trips to California. (Tr. 102-03). Montgomery testified that neither Braselton or Preisser had asked him about his travel when he made the comment. (Tr. 103-04).

Montgomery testified that he was shown a *Miranda* form and acknowledged that he read the rights, placed his initials next to each right, understood each right, and agreed to answer the agents' questions. (Tr. 101, 105-06, 110). Montgomery further testified that he had previously been convicted of six felonies, including possession of a forged instrument in the second degree, identify theft, criminal possession of stolen property, burglary and attempted burglary. (Tr. 107-09). According to Montgomery, he had been arrested and advised of his *Miranda* rights in connection with each of his prior convictions and had exercised his right to remain silent on at least one prior occasion. (Tr. 109-10).

**DISCUSSION**

Montgomery seeks to suppress all statements he made after his arrest on February 23, 2012. (Docket # 399). According to Montgomery, he made two statements to Preisser and Braselton prior to being advised of his *Miranda* rights: a comment concerning "trips to the West Coast" and a response to a "test question" concerning whether he had ever been known as "Nixon."

According to Montgomery, Preisser violated his Fifth and Sixth Amendment rights by asking him the "test question" without first advising him and obtaining a waiver of his *Miranda* rights.[5] Montgomery also argues that Preisser's recitation of the charges and evidence against him, coupled with the advice that it would be in his interest to cooperate, constituted both the functional equivalent of interrogation in violation of the Fifth Amendment and the deliberate elicitation of information in violation of the Sixth Amendment. For these reasons, Montgomery contends, the statements he made prior to the administration of *Miranda* warnings must be suppressed. He also maintains that all of his post-*Miranda* statements should be suppressed as fruit of the pre-*Miranda* Fifth and Sixth Amendment violations. (*Id.* at 16). Finally, Montgomery urges the Court to reject the agents' testimony in view of discrepancies between their versions of events, as well as their inability to recall certain details.

---

[5] Montgomery's post-hearing memorandum does not make clear whether he still contends that the agents expressly interrogated him prior the administration of the *Miranda* warnings. (Docket # 399 at ¶¶ 3, 34). On the one hand, the memorandum states that there is no dispute that "no questions were asked of the defendant before the execution by him of the *Miranda*" form, but on the other hand states that "[t]he parties differ however as to whether the defendant was asked whether he was ever known as 'Nixon' before being advised of his *Miranda* rights." (*Id.*). The Court will construe the motion to include the contention that Montgomery was explicitly questioned prior to the administration of *Miranda* warnings.

9

The government disputes that Montgomery made any pre-*Miranda* statements. (Docket # 407 at 9). According to the government, Braselton and Preisser both testified that both the statements about the name "Nixon" and Montgomery's trips to the west coast were made after Montgomery was advised of and waived his *Miranda* rights. (*Id.* at 9-10). In any event, according to the government, neither agent explicitly interrogated Montgomery, nor did Preisser violate the Fifth or Sixth Amendments by reciting the charges and evidence against him or by advising him to cooperate. (*Id.* at 8-10).

I. **Montgomery's Fifth Amendment Challenge**

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right. *Miranda v. Arizona*, 384 U.S. at 444. Accordingly, "[e]ven absent the accused's invocation of [his rights], the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (alteration in original) (quoting *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010)), *cert. denied*, 132 S. Ct. 1610 (2012). To establish a valid waiver, the government must prove by a preponderance of the evidence that (1) the waiver was "knowing" – namely, that it was "made with a full awareness of both the nature of the right being abandoned

and the consequences of the decision to abandon it," and (2) it was "voluntary" – namely, "that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993). In evaluating the totality of the circumstances, the court must assess: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131 S. Ct. 969 (2011). Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary. *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 954 (2011)), *cert. denied*, 133 S. Ct. 48 (2012).

Here, the government does not contest that Montgomery was in custody at the time he made the statements in question. Rather, the question is whether Montgomery was advised of and validly waived his *Miranda* rights prior to providing the statements. The record before this Court, including the testimony of Agents Preisser and Braselton, which I credit, demonstrates that Montgomery was advised of his *Miranda* rights and voluntarily agreed to

waive them prior to making any statements. Although the parties dispute whether Preisser's statements to Montgomery prior to the administration of the *Miranda* warnings constituted the equivalent of interrogation, I conclude that I need not reach that issue because Montgomery's statements were made only after the *Miranda* warnings were administered and he waived his rights.[6]

Both Preisser and Braselton testified that Montgomery was not asked any questions by the agents until after he was informed of his *Miranda* rights and had agreed to talk to the agents. Further, neither agent recalled Montgomery being asked a "test question," but both agents recalled Montgomery being asked about the name "Nixon" after the *Miranda* advisement and waiver. Further, neither agent recalled Montgomery making any pre-*Miranda* statements, and Preisser specifically recalled that Montgomery's statements concerning trips to the west coast occurred after Montgomery had executed the rights form.

Montgomery urges the Court to conclude that the agents' testimony is unreliable based upon a few inconsistencies between the agents' recollections and their inability, especially

---

[6] To the extent Montgomery argues that the statements he made during the interview that was conducted after he executed the *Miranda* form were tainted by his pre-*Miranda* statements, such argument is unavailing in light of my conclusions that Montgomery did not make any pre-*Miranda* statements and that his statements to the agents were otherwise voluntary. *See Vasquez v. Senkowski*, 1999 WL 359760, *6 (S.D.N.Y. 1999) ("petitioner is not automatically entitled to suppression of the statements he made to detectives after he was advised of the *Miranda* warnings simply because the initial questioning of him commenced before *Miranda* warnings were administered [;] . . . the admissibility of petitioner's post-*Miranda* statements turns on whether the circumstances surrounding the detectives' initial questioning of petitioner 'were so coercive as to prevent him from making a subsequent knowing and voluntarily waiver of his rights, thereby requiring suppression of his ... warned confession'") (quoting *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998)); *see also McMillon v. Culley*, 380 F. App'x 63, 66 (2d Cir.) (admission of post-*Miranda* statements proper where the defendant's pre-*Miranda* statements were not inculpatory), *cert. denied*, 131 S. Ct. 426 (2010); *see also White v. Bellnier*, 2011 WL 6780995, *6 (E.D.N.Y. 2011) (admission of post-*Miranda* statements proper where petitioner made no incriminating statements prior to *Miranda* waiver and where "the circumstances surrounding petitioner's post-*Miranda* confession and the entire course of police conduct support a conclusion that petitioner's incriminating statements were voluntarily made"); *see also United States v. Fellers*, 397 F.3d 1090, 1096 (8th Cir.) (violation of 6th Amendment right to counsel does not automatically require suppression of statements made after informed waiver of right to counsel), *cert. denied*, 546 U.S. 933 (2005), *abrogated on other grounds as recognized by United States v. Thorpe*, 447 F.3d 565, 569 n.3 (8th Cir. 2006).

Braselton's, to recall some of the details of the arrest and interview of Montgomery. Having carefully reviewed and evaluated the testimony of both agents, I find their testimony credible and reliable. I find it unremarkable that Braselton, who was not involved in the investigation and was merely assisting with the arrest, was unable to recall some of the details of the arrest, including what time the agents initially met that day, what they were wearing, whether their holsters were visible, whether the team had visited the premises earlier in the day, and who escorted Montgomery from the apartment.

In addition, I find that many of the purported inconsistencies between Preisser's and Braselton's recollections are not necessarily inconsistencies. For instance, Montgomery contends that Braselton testified that he did not point his service weapon at Montgomery, while Preisser testified that Braselton did. (Docket # 399 at ¶ 31). A review of Preisser's testimony, however, reveals that Preisser was equivocal as to whether both agents had pointed their guns at Montgomery, testifying that he was "pretty sure" that they both had aimed their guns at the defendant because "that is the standard operating procedure." (Tr. 75). The only evident inconsistency identified by Montgomery relates to their testimony concerning who read aloud the *Miranda* warnings. Braselton testified that he read at least the first right out loud, and Preisser, by contrast, testified that Montgomery had read each of the rights out loud. This inconsistency "do[es] not materially affect the analysis of the issues presented in th[is] suppression motion and, in any event, [is] not uncommon when two witnesses testify about the same course of events." *See United States v. Sinclair*, 2013 WL 6148078, *6 n.4 (W.D.N.Y. 2013).

On the record before me, I find that Montgomery was properly advised of his *Miranda* rights and voluntarily waived them before speaking to the agents. Specifically,

13

Braselton testified that he read aloud to Montgomery the first of the *Miranda* warnings from a rights form and asked Montgomery to read the remaining rights and to place his initials after each right.  Montgomery completed reading the entire form out loud, initialed after each right, and executed the form.  Montgomery also testified that he read the rights on the form, initialed after each right and executed the form.  In addition, Montgomery admitted that he understood the rights, including the right to refuse to answer any questions, and agreed to answer the agents' questions.  During the subsequent interview, Montgomery did not request an attorney or that the questioning cease.

Although the circumstances of the officers' entry into the apartment that day may have been intimidating, those circumstances, without more, do not render Montgomery's statements involuntary.  *See United States v. Laidlaw*, 2010 WL 382551, *6 (D. Conn. 2010) ("[a]lthough being arrested by officers who have their weapons drawn is intimidating, 'the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness'") (quoting *United States v. Snype*, 441 F.3d 119, 131 (2d Cir.), *cert. denied*, 549 U.S. 923 (2006)).  After the entry, the officers holstered their weapons, gathered Montgomery's sweatshirt and medications, and assisted Montgomery down the stairs.  Once outside, Montgomery was permitted to have a cigarette prior to being placed in the police vehicle.  The interview of Montgomery was conducted in the police vehicle during the drive to Rochester after Montgomery was advised of his *Miranda* rights and executed the rights form, which occurred approximately twenty minutes after Montgomery's arrest.  At some point during the trip, the agents stopped at a fast food restaurant to allow Montgomery to eat.  The entire trip took approximately two and a half hours.  On this record, I conclude that Montgomery's waiver

of his *Miranda* rights was voluntary. *See United States v. Phillips*, 2009 WL 1918931, *2-3 (N.D. W. Va. 2009) (statement and consent were voluntary where "any guns which were drawn had been holstered well prior to the interview, the accused had been moved to a police car with only three officers present, and the surprise of the arrest had somewhat dissipated"). The fact that Preisser advised Montgomery of the charges against him, the potential sentence under the guidelines and that it was in his interests to cooperate does not undermine my conclusion that Montgomery's waiver and subsequent statements were voluntary. *See United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive"), *cert. denied*, 516 U.S. 1182 (1996); *United States v. Bye*, 919 F.2d 6, 9-10 (2d Cir. 1990) ("we are unconvinced that the mere mention of the possible sentence facing a defendant and the benefits to be derived from cooperation converts an otherwise proper encounter between the police and the accused into a coercive and overbearing experience").

In sum, I find that Montgomery was properly advised of his *Miranda* rights and knowingly and voluntarily waived those rights before making any statements. Accordingly, it is my recommendation that Montgomery's motion to suppress statements on the grounds that they were made in violation of his Fifth Amendment rights be denied.

## II. **Montgomery's Sixth Amendment Challenge**

A defendant's right to counsel under the Sixth Amendment attaches "at the 'initiation of adversary judicial proceedings,' such as the filing of an indictment." *United States v. Yousef*, 327 F.3d 56, 140 (2d Cir.) (quoting *United States v. Gouveia*, 467 U.S. 180, 188

15

(1984); *United States v. Abdi*, 142 F.3d 566, 569 (2d Cir. 1998)), *cert denied*, 124 S. Ct. 353 (2003); *see Fellers v. United States*, 540 U.S. 519, 523 (2004) (Sixth Amendment is "triggered at or after the time that judicial proceedings have been initiated") (quoting *Brewer v. Williams*, 430 U.S. 387, 398 (1977)). "Once the right has attached, the Sixth Amendment renders inadmissible in the Government's case-in-chief statements elicited by the Government outside the presence of a defendant's counsel that are not accompanied by a waiver of this right." *United States v. Yousef*, 327 F.3d at 140 (citing *United States v. Henry*, 447 U.S. 264, 273-74 (1980)). As reiterated recently by the Supreme Court, "[a]n accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents ... deliberately elicited from him after he had been indicted and in the absence of his counsel." *Fellers v. United States*, 540 U.S. at 523 (quoting *Massiah v. United States*, 377 U.S. 201, 206 (1964)). This Sixth Amendment "deliberate-elicitation" standard is distinguishable from the "custodial-interrogation" standard utilized in a Fifth Amendment analysis. *Id.* at 524.

It is equally well-established, of course, that a defendant may validly waive his Sixth Amendment rights. *Patterson v. Illinois*, 487 U.S. 285, 296 (1988) ("As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one"); *Yousef*, 327 F.3d at 140 ("It is settled law, however, that the attachment of the Sixth Amendment right to counsel, by itself, does not preclude a defendant from validly waiving his right to counsel").

16

No question exists that Montgomery's Sixth Amendment rights had attached at the time of his arrest. The indictment charging Montgomery was returned and filed on February 16, 2012. (Docket # 126). His arrest and interview occurred approximately one week later, on February 23, 2012. (Tr. 4-5). Accordingly, the sole question before this Court is whether Montgomery had validly waived his Sixth Amendment rights prior to making the challenged statements. I find that he had.

As discussed more fully above, Montgomery was provided a copy of a *Miranda* warnings and waiver form, and it was read out loud in its entirety either by him or by Braselton. The form specifically advised Montgomery that he had the right to talk to an attorney before questioning and to have an attorney present. (G. Ex. 1). Montgomery was also advised that an attorney would be appointed for him if he could not afford one and that he had the right to stop the questioning at any time if he decided that he desired the assistance of counsel. (*Id.*). Montgomery placed his initials after each right, executed the form, and testified that he understood his rights and that he had agreed to speak with the agents. On this record, I find that Montgomery was adequately advised of his Sixth Amendment right to counsel and knowingly and voluntarily waived it when he agreed to speak with the agents. *See Yousef*, 327 F.3d at 142 (statements made by defendant after indictment were not obtained in violation of the Sixth Amendment when the defendant had received *Miranda* warnings, had voluntarily waived those rights and had not invoked his right to counsel). Finally, as discussed above, I have concluded that Montgomery made no statements prior to executing the *Miranda* waiver. Accordingly, it is my recommendation that Montgomery's motion to suppress statements on the grounds that they were made in violation of his Sixth Amendment rights be denied.

17

## **CONCLUSION**

For the reasons stated above, I recommend that the district court deny Montgomery's motion to suppress statements made after his arrest on February 23, 2012. (Docket # 312).

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated:  Rochester, New York
       December  4 , 2013

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[7]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                          *s/Marian W. Payson*
                          MARIAN W. PAYSON
                          United States Magistrate Judge

Dated: Rochester, New York
       December  4 , 2013

---

[7] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).